FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 MAR 26 AM 11: 18

CLERK J. Hodge
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| DIANA P. HARRIS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| | * | CV 118-152 |
| v. | * | |
| | * | |
| SAVANNAH RIVER REMEDIATION | * | |
| DISABILITY SHORT AND LONG TERM | * | |
| DISABILITY PLAN, | * | |
| | * | |
| Defendant. | * | |

---

**O R D E R**

---

Before the Court are the Parties' motions for summary
judgment. (Docs. 17, 19.) Plaintiff Diana P. Harris moves for
summary judgment on her claims brought pursuant to the Employee
Retirement Income Security Act of 1974 as amended ("ERISA"), 29
U.S.C. § 1001 et seq., and the Defendant, in turn, moves the Court
to enter judgment in its favor. The Clerk has given each party
notice of the opposing summary judgment motion, the summary
judgment rules, and the consequences of default. Thus, the notice
requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th
Cir. 1985) (per curiam), have been met. For the following reasons,
Plaintiff's motion for summary judgment (Doc. 17) is **DENIED**, and
Defendant's motion for summary judgment (Doc. 19) is **GRANTED**.

## I.   BACKGROUND[1]

This case arises out of the denial of Plaintiff Diana P. Harris' claim for continued long-term disability benefits under the SRR Disability Income Plan[2], an ERISA-governed employee welfare benefit plan ("the Plan").   Plaintiff received long-term disability benefits under the Plan starting January 1, 2017, and these benefits were terminated, effective February 15, 2017.  (Doc. 19-5 at SRR-000183, SRR-000186.)   After Plaintiff's first and second level appeals were denied, Plaintiff filed this action against the Plan (also referred to herein as "Defendant") pursuant to 29 U.S.C. § 1132(a)(1)(B).

In 2015, Plaintiff began a job as an Associate Process Improvement Analyst at the office of Savannah River Remediation, LLC.  (Doc. 17-1 at 2, 4, 5.)  Her job responsibilities included utilizing such methodologies as Six Sigma and Lean Management, educating others, holding meetings and events, and collecting and analyzing data.   (Id.; Pl.'s Res. to St. Mat. Facts, Doc. 26-2, ¶ 1.)   Plaintiff used a computer and often worked with others. (Doc. 17-1 at 4.)   Plaintiff frequently needed to lift items weighing ten pounds or less, occasionally lifted items weighing

---

[1] The factual background and the Court's review are based on the administrative record documents produced by the parties.  Defendant produced, per agreement, documents bates labeled SRR-000001 through SRR-000258.  (Docs. 19-1, 19-2, 19-3, 19-4, 19-5, 19-6.)  Plaintiff also produced additional documents it contends are part of the administrative record.  (Docs. 17-1, 17-2, 17-3.)

[2] Plaintiff mistakenly refers to the Defendant as "Savannah River Remediation Disability Short and Long Term Disability Plan."  The plan is properly termed the "SRR Disability Income Plan."  (Answer, Doc. 5 at 1; Doc. 19-1 at 21.)

eleven to twenty-five pounds, and seldom lifted heavier items. (Id. at 4.) During a workday, she typically sat for four hours, and the rest of the day was spent walking, climbing stairs, and standing. (Id.)

Plaintiff began a term of short-term disability on May 23, 2016 due to symptoms of abdominal pain and later an assessment of biliary dyskinesia.[3] (Doc. 17-1 at 2, 3; Pl.'s Res. to St. Mat. Facts, Doc. 26-2, ¶ 18-20.) In the months that followed, Plaintiff underwent a litany of tests, many of which were ordered by her treating gastroenterologist, Dr. Glen Portwood. (Doc. 19-6 at SRR-000217-28.) The tests included an MRI, a breath test, a fecal calprotectin test, a hepatobiliary scan, an endoscopy procedure with biopsies of her small bowel, stomach, and esophagus, and a gastric emptying study. (Id.) With the exception of a positive breath test for SIBO[4] which was treated with antibiotics, none of the tests provided any insight into the cause of her abdominal symptoms. (Doc. 19-3 at SRR-000101; Doc. 19-6 at SRR-000217-28.)

On October 20, 2016, Plaintiff had her gallbladder removed by Dr. Chris Carlson in an attempt to treat her upper abdominal pain. (Doc. 19-5 at SRR-000203-07.) Then, on December 14, 2016, Plaintiff underwent a hysterectomy to treat pelvic pain and midline

---

[3] Biliary dyskinesia is a disorder of the biliary part of the digestive system that affects the gallbladder and sphincter. (Pl.'s Am. St. Mat. Facts, Doc. 22, ¶ 13 n.3; Def.'s St. Mat. Facts, Doc. 23, ¶ 18 n.1.)
[4] SIBO is small intestinal bacterial overgrowth.

cystocele. (Id. at SRR-000188.) Plaintiff's short-term disability benefits ended in December 2016 (Doc. 17-1 at 2; Pl.'s Am. St. Mat. Facts, Doc. 22, ¶ 24), and on December 22, 2016, the surgeon from her hysterectomy, Dr. Kelly Norman, submitted an "Attending Physician Statement of Claim for Disability Benefits" in which she indicated Plaintiff's activities needed to be restricted "due to [her] recovery" with expected improvement by February 15, 2017. (Doc. 19-5 at SRR-000197-98.)

On January 3, 2017, Sedgwick Claims Management Services, Inc. ("Sedgwick")[5], the third-party claims administrator for Defendant (see Doc. 19-1 at 21), approved long-term disability benefits for Plaintiff through February 14, 2017, effective January 1, 2017. (Doc. 17-1 at 73.) On that date, Sedgwick sent Plaintiff a letter notifying her she was approved for long-term disability benefits "beginning 01/01/2017." (Doc. 19-5 at SRR-000186.) The letter further noted "Sedgwick may periodically review your physical condition to determine continued participation under the Plan." (Id.) Upon being contacted by Sedgwick on January 23, 2017, Plaintiff acknowledged she had no complications with the hysterectomy, but indicated she was still having abdominal pain.

---

[5] As Claims Administrator, Sedgwick had authority to determine Plaintiff's qualification for long-term disability benefits and to decide the initial appeal of any denial of long-term disability benefits. (Doc. 19-1 at SRR-000009, SRR-000012.) Under the Plan, Plaintiff could file a second and final appeal with the Plan Administrator, who had authority to make the final decision on benefits. (Doc. 19-1 at SRR-000012-13.)

(Doc. 17-3 at 23.) Sedgwick advised Plaintiff that in order to extend the benefits past February 15, 2017, it would need medical support. (Id.)

In the weeks that followed, Sedgwick received documentation from Plaintiff's treating physicians regarding her health status. (See Doc. 19-5 at SRR-000183.) Dr. Norman's January 23, 2017 progress notes indicated Plaintiff "continues to feel sore but denies severe pain" and "[s]he still has some lower abdominal pressure with sitting" but "denies GI or urinary complaints." (Doc. 19-4 at SRR-000157.) Sedgwick's claims records indicate that on February 1, 2017, Plaintiff told Sedgwick by phone that she was still healing and still had abdominal pain and severe nausea. (Doc. 17-3 at 20.)

On February 20, 2017, Plaintiff saw gastroenterologist Dr. Portwood again. (Doc. 19-3 at SRR-000114.) Dr. Portwood's notes from the February 20 visit indicate Plaintiff continued with symptoms despite therapy for SIBO, noting some improvement of lower abdominal pain. (Id.) He also noted Plaintiff complained of nausea, dyspepsia and burning in the epigastric area that had escalated in the prior three to four weeks. (Id.) According to Dr. Portwood's notes, his impression was nausea and reflux esophagitis, and he adjusted Plaintiff's medications in an attempt to treat. (Id. at SRR-000115.)

On February 28, 2017, Dr. Portwood completed a form entitled "Attending Physician's Statement of Long Term Disability," writing: "This patient has a positive diagnosis of GERD[6] [and] SIBO which can result in severe flare ups requiring the patient to be absent from work at time[s]." (Doc. 19-5 at SRR-000212–13.) Dr. Portwood diagnosed Plaintiff with "GERD, Chronic SIBO [and] nausea [and] chronic lower abdominal pain." (Id. at SRR-000212.) In the form, Dr. Portwood noted Plaintiff was ambulatory, could lift ten to twenty-five pounds, and could sit, stand, and walk with rests. (Id. at SRR-000212–13.) He also noted she would have occasional restrictions with bending, stooping, climbing, squatting, reaching above the shoulder, and driving, and he expected her condition to improve within one year. (Id.)

On March 1, 2017, a Sedgwick representative issued a letter to Plaintiff denying her claim for long-term disability benefits as of February 15, 2017. (Id. at SRR-000183–84.) Plaintiff appealed the denial (Doc. 19-6 at SRR-000257), and thereafter Sedgwick engaged Dr. Morris Elevado, a board-certified gastroenterologist, to conduct an independent review of Plaintiff's medical records. (Id. at SRR-000238–46.) After reviewing Plaintiff's records and speaking with Dr. Portwood on May 1, 2017, Dr. Elevado issued a report concluding "claimant has

---

[6] GERD is gastroesophageal reflux disease.

6

no functional disability nor warrants any restrictions at work [f]rom 2/15/17-return to work" and "the claimant can return to work as of 2/15/17 as an Associate Process Improvement Analyst without restrictions." (Id. at SRR-000242, SRR-000244, SRR-000246.) His report stated his determination was in part based on Plaintiff's post-operative office notes from Dr. Carlson, which indicated Plaintiff was "without any complaints" following her gallbladder removal, and her post-hysterectomy office notes from Dr. Norman, which "reported a negative abdominal exam" (Id. at SRR-000244.) Dr. Elevado's report also noted that Crohn's disease had been ruled out and Plaintiff's SIBO had been treated. (Id.) While Dr. Elevado acknowledged that Dr. Portwood diagnosed Plaintiff with a "functional disorder with severe GI symptoms but unclear for an etiology," he disagreed with Dr. Portwood's recommendations for restrictions at work. (Id. at SRR-000244-45.)

On May 23, 2017, Sedgwick issued a letter upholding its denial of Plaintiff's long-term disability benefits, stating that Dr. Elevado, in his review, concluded "the medical information does not support an inability to perform your own occupation from February 15, 2017 to your return to work." (Id. at SRR-000238-39.) The letter further noted:

> Although Dr. Portwood noted that SIBO with + breath test can result in severe flare ups which may require you to be absent at times, the medical documentation provided would not support a need for a continuous leave of absence. There is insufficient objective

7

medical evidence provided to support that your
condition was of such severity that it would preclude
you from being able to perform your own occupation
beginning February 15, 2017. . . .

[W]e have determined that the medical information
submitted does not demonstrate that you are disabled
as defined by the Plan.

(Id.)

Thereafter, Dr. Portwood sent a letter to Sedgwick dated June
16, 2017, summarizing Plaintiff's history of gastrointestinal
problems and interventions, and stating:

[D]espite extensive evaluation and extensive
medication trials, she continues to have daily
symptoms predominantly including nausea and abdominal
pain. These symptoms are at times severe and also
quite unpredictable and can flare with minimal warning
in rapid escalation. These symptoms impact her daily
quality of life and have impacted her ability to be
able to work given their frequent nature and their
severity and unpredictable pattern.

(Doc. 19-3 at SRR-000101.)

On July 5, 2017, Sedgwick received a correspondence from
Plaintiff's attorney indicating Plaintiff's desire to appeal the
May 23, 2017 denial of benefits. (Doc. 17-1 at 49-50.) As part
of the appeal process, two additional doctors, Dr. Lyle Mitzner,
a physician board certified in internal medicine and
endocrinology, and Dr. Jeffrey Jacobs, a board-certified
gastroenterologist, conducted independent reviews of Plaintiff's
case. (Doc. 19-1 at SRR-000027-43; Doc. 19-2 at SRR-000044-52;
Doc. 26-2 at 23-25.) On November 30 and December 7, 2017,

8

Plaintiff's attorney sent the Plan Administrator additional medical records from Plaintiff's treating providers, including endocrinology records, records from an October 2017 gastroenterology consult at UNC Healthcare, and pharmacy records. (Doc. 19-2 at SRR-000060; Doc. 19-3 at SRR-000100.)

Plaintiff's UNC records indicate she was diagnosed with abdominal pain, refractory nausea, irritable bowel syndrome, epigastric pain and chest pain. (Doc. 19-2 at SRR-000077.) The progress notes from her October 26, 2017 visit to UNC state that during work Plaintiff "possibly delayed urge to defecate," that "[n]ausea is the most predominant symptom at this time" as well as "cramping and discomfort which she knows can occur on and off throughout the day." (Id. at SRR-000082.) Plaintiff's UNC treatment plan involved stopping one of her medications "due to possible exacerbation of symptoms." (Doc. 19-3 at SRR-000087.)

Plaintiff's attorney also submitted a completed questionnaire from Dr. Portwood, dated December 5, 2017. (Doc. 19-2 at SRR-000060; Doc. 19-6 at SRR-000258.) The questionnaire indicated Dr. Portwood felt the "patient's attention and concentration impairments would make sustained employment on a competitive basis 40 hours per week difficult," and noted that "if flaring[,] patient may be unable to perform duties." (Doc. 19-6 at SRR-000258.) The form, however, also indicated that Plaintiff would not experience an unreasonable number of absences as a result of her medical

conditions, estimating she "may miss 1-2 days per month," and that Plaintiff's pain and medications would not require her to lie down during the eight-hour day. (Id.)

The additional medical records were forwarded to the independent physician reviewers. (Doc. 19-1 at SRR-000032-39; Doc. 19-2 at SRR-000046-52.) At the completion of his review, Dr. Mitzner concluded that "[f]rom an endocrinologic perspective, there would be no functional impairments from the claimant's thyroid history from 02/15/17 and ongoing." (Doc. 19-1 at SRR-000038.) Dr. Jacobs, after reviewing the medical records and speaking with Dr. Portwood (id. at SRR-000041), concluded the "patient has a functional bowel disorder which would not result in a disability claim," and further stated, "I disagree with the treating provider's determination that the claimant was unable to work. . . . [T]here was no evidence that the claimant was disabled during the time period in question. . . . [T]he claimant requires no restrictions or limitations in her work environment." (Doc. 19-2 at SRR-000050.)

On March 7, 2018, the Plan Administrator issued a final denial letter noting that all the information, including the additional documentation from Plaintiff's attorney, had been reviewed. (Doc. 19-1 at SRR-000025.) The letter concluded that the additional documentation "does not demonstrate that Ms. Harris is unable to perform her job duties." (Id.) Specifically, the letter

referenced Dr. Portwood's conclusion that Plaintiff would only miss one to two days of work per month. (Id.) The letter also noted that the UNC records did not demonstrate that Plaintiff had been unable to work since February 15, 2017. (Id.)

Plaintiff, thereafter, filed this lawsuit in an attempt to challenge the denial of her long-term disability benefits under the Plan. (Doc. 1.) Because this case arises under ERISA, 29 U.S.C. § 1001 et seq., this Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

## II. LEGAL STANDARDS

"[T]he standard of review applicable to ERISA cases is somewhat different than in other cases." Ruple v. Hartford Life and Acc. Ins. Co., 340 F. App'x 604, 610 (11th Cir. 2009). "In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (unpublished per curiam opinion) (citation omitted). "Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Blankenship v. Metropolitan Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011).

As the text of ERISA does not set forth standards for the district court to apply when reviewing a benefits determination, see Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989), the Eleventh Circuit, based on the Supreme Court's guidance, has established a multi-step framework to guide courts in their reviews of benefits decisions. Blankenship, 644 F.3d at 1354. The court has identified the relevant steps as follows:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355.[7]  "[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest."  Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 96 (11th Cir. 2010).  While "[c]ourts must account for a structural conflict of interest, when one exists, as 'a factor' in the analysis . . . the basic analysis still centers on assessing whether a reasonable basis existed for the administrator's benefits decision."  Blankenship, 644 F.3d at 1355.

## III. DISCUSSION

### A. Standard of Review for Plan Administrator's Decision

Both parties acknowledge the Plan granted the Plan Administrator discretionary authority in reviewing Plaintiff's eligibility for benefits.  (Pl.'s Br. Supp. Mot. for Summ. J., Doc. 17-4 at 12; Def.'s Mot. for Summ. J., Doc. 19 at 16; Doc. 19-1 at SRR-000013.[8])  Accordingly, even if the Court determines the

---

[7] The courts no longer apply the heightened arbitrary and capricious standard to a conflicted administrator's benefits decision.  Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1195-96 (11th Cir. 2010).  "Instead, 'the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious."  Id. at 1196 (citing Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008)).

[8] The Plan states: "The Plan Administrator, and those persons acting on the Plan Administrator's behalf, are vested with full power and sole discretion to interpret all the terms of the Plan, and the discretionary authority to make all determinations of fact or law."  (Doc. 19-1 at SRR-000013.)  The Plan further states: "The Plan Administrator also has the sole discretion to decide all issues of fact or law" (id. at SRR-000017), and further notes that "the LTD Claims Administrator for the Plan, Sedgwick CMS has discretionary authority to determine [the employee's] qualification for LTD benefits."  (Id. at SRR-000009.)

benefits decision is wrong, the Court must apply a deferential standard of review to the Plan Administrator's decision to deny long-term disability benefits. See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 109–110 (2008) ("Because the plan granted [defendant] 'discretionary authority to . . . determine benefits,' the Court of Appeals reviewed the administrative record under a deferential standard."); Firestone, 489 U.S. at 115 ("[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."); see also Till v. Lincoln Nat'l Life Ins. Co., 678 F. App'x 805, 808 (11th Cir. 2017) (forgoing analysis of whether decision was de novo wrong where defendant had discretionary authority under the plan). As outlined above, in applying the deferential standard, the Court must determine whether reasonable grounds supported the Plan Administrator's final decision to deny benefits. See Blankenship, 644 F.3d at 1355.

In order to qualify for long-term disability benefits under the Plan, Plaintiff had to be "unable to perform the Essential Functions of [her] Normal Occupation." (Doc. 19-1 at SRR-000009.) The Plan describes "Essential Functions of Your Normal Occupation" as meaning that "you are unable to perform the essential functions of the occupation you routinely performed at the time disability

14

begins" and further defines the term as "the fundamental job duties intrinsic to the employment position that you hold. These do not include marginal or peripheral functions. In determining the essential functions of a job, the focus is on the purpose of the function and result to be accomplished, rather than how the function is performed." (Id. at SRR-000009, SRR-000021.) The Plan Administrator, in denying Plaintiff long-term disability benefits, determined that Plaintiff failed to adequately show how she was "unable to perform her job duties." (Mar. 7, 2018 denial letter, Doc. 19-1 at SRR-000025.)

After considering Plaintiff's arguments in her motion for summary judgment and conducting a thorough review of all the administrative record documents submitted by the parties (Docs. 17-1, 17-2, 17-3, 19-1, 19-2, 19-3, 19-4, 19-5, 19-6)[9], which includes Plaintiff's medical records, the independent physician reviews, the correspondence regarding Plaintiff's request for disability benefits, as well as the rest of the claims file, the Court concludes that the Plan Administrator's decision to deny benefits was neither wrong nor unreasonable.

The Court, herein, discusses its reasons for affirming the Plan Administrator's denial of benefits and explains why

---

[9] See Townsend v. Delta Family-Care Disability & Survivorship Plan, 295 F. App'x. 971, 976 (11th Cir. 2008) ("Our case law is settled that we are limited to only those documents that were before the administrator.").

Plaintiff's arguments in her motion for summary judgment fail to show the denial was wrong or unreasonable.

### 1. Plaintiff's Argument that Plan Administrator Wrongly Failed to Consider Dr. Portwood's Opinions

Plaintiff, in her motion for summary judgment, argues the Plan Administrator wrongly and arbitrarily discounted the opinions of her treating physician, Dr. Portwood. (Pl.'s Br. Supp. Mot. for Summ. J., Doc. 17-4 at 13-14.) The Court, in conducting its review of the administrative record, considered the various office notes and records from Dr. Portwood. Specifically, on April 6, 2017, Dr. Portwood's notes state Plaintiff "feels unable to work" and "patient remains quite [symptomatic] and unable to work given daily [symptoms], severity of [symptoms] and persistence of [symptoms]." (Doc. 19-3 at SRR-000111-12.) His May 9, 2017 office notes indicate "she continues to be unable to work with daily [symptoms]," and on June 8, 2017, he writes, "[she] continues with daily [symptoms] that are debilitating in terms of function and ability to work . . . ." (Id. at SRR-000105-08.)

However, Dr. Portwood also submitted several documents that indicated Plaintiff's condition only sometimes limited her ability to do her job. In particular, on February 28, 2017, Dr. Portwood submitted his "Statement of Long Term Disability" to Sedgwick in which he described Plaintiff as "ambulatory", indicated she could lift ten to twenty-five pounds, and could sit, stand, and walk

with rests, with occasional restrictions on bending, stooping, climbing, squatting, reaching, and driving. (Doc. 19-5 at SRR-000212-213.) In the form, Dr. Portwood noted Plaintiff's condition would require her "to be absent from work at time[s]." (Id.) In December 2017, Dr. Portwood completed another form, which estimated Plaintiff "may miss 1-2 days per month," and opined her pain and medications would not require her to lie down during the eight-hour day. (Doc. 19-6 at SRR-000258.) Dr. Portwood's June 16, 2017 letter to Sedgwick similarly failed to adequately show that Plaintiff was unable to perform her job duties, only stating that Plaintiff's "symptoms are at times severe." (Id. at SRR-000101.) While he also stated, "[t]hese symptoms impact her daily quality of life and have impacted her ability to be able to work given their frequent nature and their severity and unpredictable pattern," (id.), he failed to describe in what ways Plaintiff would be unable to perform her job duties.

"To the extent other evidence in the record suggests that a claimant is disabled, a plan administrator is entitled to weigh the evidence and resolve conflicting evidence about the claimant's disability." Townsend v. Delta Family-Care Disability & Survivorship Plan, 295 F. App'x. 971, 977 (11th Cir. 2008). Taken as a whole, the documents from Dr. Portwood can reasonably be interpreted as indicating Plaintiff had ongoing issues of abdominal pain, nausea, and discomfort that could *at times* impact

her ability to work. None of the documents submitted by Dr. Portwood in support of Plaintiff's claimed disability indicates Plaintiff was so physically or cognitively impaired that she would continuously be unable to perform the tasks of her job, which involved sitting, working on the computer, working with others, light lifting, pushing/pulling, reaching, and some standing, walking and climbing. (Doc. 17-1 at 2, 4, 5; Pl.'s Am. St. Mat. Facts, Doc. 22, ¶¶ 2-3.) Accordingly, it was not unreasonable or wrong for the Plan Administrator, in considering Dr. Portwood's records and opinions, to conclude that Plaintiff did not qualify for long-term disability benefits. See Slomcenski v. Citibank, N.A., 432 F.3d 1271, 1280 (11th Cir. 2005) ("An administrator's determination must be upheld if it has a reasonable factual basis, even if the record also contains contrary information.").

In addition to Dr. Portwood's opinions, the Plan Administrator also considered the opinions of three independent physician reviewers- an endocrinologist and two gastroenterologists. Both gastroenterologists reviewed Plaintiff's medical records and contacted Dr. Portwood to discuss Plaintiff's case, and both concluded her abdominal issues did not result in a disability. Similarly, the reviewing endocrinologist concluded there were no functional impairments caused by Plaintiff's thyroid history. While Plaintiff argues the Plan Administrator improperly refused to credit Dr. Portwood's opinions

18

(see Pl.'s Br. Supp. Mot. for Summ. J., Doc. 17-4 at 13-14), the law provides that "plan administrators are not obliged to accord special deference to the opinions of treating physicians." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003). Accordingly, it was not arbitrary and capricious or wrong for the Plan Administrator, in making its decision, to rely on the opinions of the independent physician reviewers, even if those opinions conflicted with Dr. Portwood's findings. See Slomcenski, 432 F.3d at 1279-80 ("Giving more weight to the opinions of some experts than to the opinions of other experts is not an arbitrary or capricious practice.").

In light of Dr. Portwood's opinions that Plaintiff would only sometimes miss work and the conclusions of the independent physician reviewers that Plaintiff was not disabled, the Court finds there were reasonable grounds to support the Plan Administrator's decision to deny Plaintiff benefits. "So long as it was supported by evidence in the administrative record, the . . . decision to deny [a plaintiff] disability benefits was not improper; it is irrelevant whether this court or anyone else might have reached a different conclusion." Townsend, 295 F. App'x at 976 (citing Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1274 (11th Cir. 2002)).

2. <u>Plaintiff's Argument that Plan Administrator's
Decision was Arbitrary and Capricious Because it Used
Wrong Definition of Disability</u>

The Court also rejects Plaintiff's argument that the Plan
Administrator's decision was arbitrary and capricious because the
wrong disability definition was cited in two of the denial letters.
(<u>See</u> Pl.'s Br. Supp. Mot. for Summ. J., Doc. 17-4 at 17.) The
Court agrees that the first two denial letters from Sedgwick
referenced the wrong standard for disability benefits under the
Plan, citing an "unable to work at any reasonable occupation"
standard. (<u>See</u> Mar. 1, 2017 denial letter, Doc. 19-5 at SRR-
000183; May 23, 2017 denial letter, Doc. 19-6 at SRR-000238.)
However, the final March 7, 2018 letter from the Plan Administrator
emphasized that "the additional documentation provided does not
demonstrate that Ms. Harris is unable to perform her job duties."
(Mar. 7, 2018 denial letter, Doc. 19-1 at SRR-000025.) The March
1, 2017 initial denial letter from Sedgwick also noted that
Plaintiff's medical records "did not give any indication as to why
you would be unable to perform your job duties." (Doc. 19-5 at
SRR-000183.) Additionally, the May 23, 2017 denial letter from
Sedgwick concluded that "[t]here is insufficient objective medical
evidence provided to support that your condition was of such
severity that it would preclude you from being able to perform
your own occupation beginning February 15, 2017." (Doc. 19-6 at
SRR-000238-39.)

Even though the first two denial letters cited to the wrong disability standard, the denials appeared to be based on the proper standard, i.e., the lack of evidence that Plaintiff could perform *her* job duties, as opposed to the more restrictive standard of being unable to work at any reasonable occupation.

Further, this Court's review is limited to the Plan Administrator's final claims decision, not the earlier denials by Sedgwick. See <u>Till v. Lincoln Nat'l Life Ins. Co.</u>, 678 F. App'x 805, 808 n.2 (11th Cir. 2017) ("This Court, in line with several other Circuit Courts of Appeal, will consider only the reasonableness of an administrator's final decision."); <u>Khoury v. Grp. Health Plan, Inc.</u>, 615 F.3d 946, 952 (8th Cir. 2010) ("Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision . . . .").

The claim appeals process provides many purposes, including "giving claims administrators an opportunity to correct errors, promoting consistent treatment of claims, providing a non-adversarial dispute resolution process, decreasing the cost and time of claims resolution, assembling a fact record that will assist the court if judicial review is necessary, and minimizing the likelihood of frivolous lawsuits." <u>Galman v. Prudential Ins. Co. of Am.</u>, 254 F.3d 768, 770 (8th Cir. 2001). By limiting its review to the final claims decision, the Court ensures that the purposes of the appeals process have been served. <u>Id.</u> at 770-71.

Accordingly, this Court concludes that the citation to the wrong standard in the earlier letters from Sedgwick in no way demonstrates that the final March 7, 2018 denial was arbitrary or capricious.

### 3. Plaintiff's Argument that Plan Administrator Denied Benefits Due to Irrelevant Factor of Etiology

Plaintiff also contends that the Plan Administrator's decision to deny benefits was unreasonable because it focused on an irrelevant factor, etiology. (See Pl.'s Br. Supp. Mot. for Summ. J., Doc. 17-4 at 15-17.) Contrary to Plaintiff's suggestion, the administrative record does not indicate that Plaintiff's disability benefits were denied solely because the doctors could not find an etiology for her symptoms. Rather, as outlined in the preceding section, all three denial letters indicated that Plaintiff's disability benefits were discontinued because there was insufficient evidence that she was unable to perform her job duties. (Doc. 19-1 at SRR-000025; Doc. 19-5 at SRR-000183; Doc. 19-6 at SRR-0000238-39.) The Court finds this reason for denial was reasonable under the Plan, supported by the administrative record, and in accordance with the terms of the Plan.[10]

_____

[10] The Plan required Plaintiff to submit satisfactory proof of her disability, and to provide medical documentation that supports her long-term disability. (Doc. 19-1 at SRR-000010-11.) In particular, she needed to demonstrate she was "unable to perform the Essential Functions of [her] Normal Occupation." (Id. at SRR-000009.)

22

## 4. Consideration of Conflict of Interest

The Court, in making its inquiry, must also take into account any conflicts of interest. See Blankenship, 644 F.3d at 1355. In this case, the Plan is self insured and funded by Savannah River Remediation, LLC. (Doc. 19-1 at SRR-000017.) The Supreme Court has found a conflict of interest exists when the "plan administrator both evaluates claims for benefits and pays benefits claims." Glenn, 554 U.S. at 112. However, rather than being a deciding factor, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." Capone, 592 F.3d at 1196 (citation omitted).

While the Court acknowledges that a conflict of interest exists in this case, it does not find that its existence rendered the ultimate denial of benefits arbitrary and capricious. In making its denial, the Plan Administrator, in addition to reviewing Plaintiff's medical records, considered three independent physician reviews which all failed to find Plaintiff was disabled. It also had a third-party claims administrator, Sedgwick CMS, perform the initial two reviews of the long-term disability claim, both of which resulted in a denial of benefits. Additionally, rather than only giving Plaintiff forty-five days after her July 5, 2017 appeal in which it would consider her file (Doc. 19-6 at SRR-000238-39), the Plan Administrator gave Plaintiff until

December 15, 2017 to submit additional information in support of her claim. (Nov. 30, 2017 letter from Pl.'s Att'y, Doc. 19-3 at SRR-000100.) During this time, Plaintiff had the opportunity to obtain and submit her relevant medical records. (Id.) Plaintiff also sought additional treatment from UNC in October 2017 and submitted those records to the Plan Administrator for review. (Dec.7, 2017 letter from Pl.'s Att'y, Doc. 19-2 at SRR-000060.) All of these records were sent out for review by the independent physicians. The March 7, 2018 final denial letter indicated a full and fair review of the file had taken place. (Doc. 19-1 at SRR-000025.)

Despite the conflict of interest raised by Plaintiff, the review by the Plan Administrator appeared to be fair, thorough, and comprehensive, and thus the conflict did not render the ultimate decision to deny Plaintiff long-term disability benefits arbitrary and capricious. There is no indication that any conflict of interest influenced the final decision to deny benefits or that a different outcome would have occurred without the conflict. Plaintiff has failed to demonstrate otherwise. See Capone, 592 F.3d at 1196 ("[T]he burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." (citation omitted)).

Having considered all the factors laid out in <u>Blankenship</u>, the Court concludes that the Plan Administrator's decision to deny long-term disability benefits to Plaintiff under the Plan should be affirmed.

### IV. CONCLUSION

For the reasons set forth above, this Court **DENIES** Plaintiff's Motion for Summary Judgment (Doc. 17) and **GRANTS** Defendant's Motion for Summary Judgment (Doc. 19). The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 26ᵗʰ day of March, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA